**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF OKLAHOMA**

MAY 10 2019
CARMELITA REEDER SHINN, CLERK
U.S. DIST. COURT, WESTERN DIST. OKLA.
BY ae ,DEPUTY

| | |
|---|---|
| **UNITED STATES OF AMERICA and the STATE OF OKLAHOMA ex rel. [UNDER SEAL]** | **CIV-15-1174-L** |
| **Plaintiff,** | **FIRST AMENDED COMPLAINT** |
| **v.** | **FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)** |
| **[UNDER SEAL]** | **TRIAL BY JURY DEMANDED** |
| **Defendant.** | |

**DOCUMENT TO BE KEPT UNDER SEAL**

Wayne Allison
Allison Legal
2004 Huntington Ave.
Nichols Hills, OK 73116
(405) 888-6933; (405) 250-2782
(866) 266-2781 (facsimile)
wayne@allisonlegal.com
*Local Counsel for Plaintiff-Relator*

R. Scott Oswald, Esq.
The Employment Law Group, P.C.
888 17th Street, NW, 9th Floor
Washington, D.C. 20006-3307
(202) 261-2802
(202) 261-2835 (facsimile)
soswald@employmentlawgroup.com
*Counsel for Plaintiff-Relator*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| **UNITED STATES OF AMERICA and the STATE OF OKLAHOMA ex rel. JENNIFFERR BAIRD** | **CIV-15-1174-L ________________** |
| **1520 Craford Ct. Oklahoma City, OK 73159** | **FIRST AMENDED COMPLAINT** |
| **Plaintiff,** | |
| **v.** | |
| **OKLAHOMA HEART HOSPITAL, LLC** | **FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)** |
| **4050 West Memorial Road Oklahoma City, OK 73120** | |
| | **TRIAL BY JURY DEMANDED** |
| **Defendant.** | |

## INTRODUCTION

1. Qui tam relator Jenniffer Baird, by and through her attorneys, individually and on behalf of the United States of America and the State of Oklahoma, files this First Amended Complaint pursuant to Fed. R. Civ. P. 15(a) against Oklahoma Heart Hospital, LLC, ("OHH" or "Defendant") to recover damages, penalties, and attorneys' fees for violations of the federal False Claims Act, 31 U.S.C. §§ 3729 *et seq*. and the Oklahoma Medicaid False Claims Act, Okla. Stat. Title 63, § 5053 *et seq*.

2. OHH knowingly engages in three types of fraudulent billing of its Medicare and Medicaid patients: (1) over-charging Medicaid for inpatients that were actually outpatients; (2) manipulating re-hospitalization rates to induce bonus payments from Medicare; and (3) falsely billing for unsigned inpatient orders.

3. First, OHH routes almost all of its Medicaid patients to inpatient treatment when many should be classified as outpatient; in doing so OHH is able to charge significantly larger fees for the same treatment. The fraud is evidenced by the fact that OHH does not treat its Medicare or privately insured patients similarly.

4. Second, OHH fraudulently manipulates its re-hospitalization rate of Medicare patients to induce the government to pay it a bonus. As part of the Affordable Care Act, hospitals incur penalties and receive bonuses based on how their re-hospitalization rate compares to the national average. In fiscal year 2014, 778 hospitals lost more than 0.2% of their Medicare pay, while 630 hospitals received a bonus of more than 0.2%. This redistribution amounted to $1.1 billion.

5. OHH manipulates its re-hospitalization statistics by treating nearly all Medicare patients who return to OHH within 30 days as outpatient, even when they have hospital stays of up to seven days. Last year, OHH received a bonus check from the Centers for Medicare & Medicaid Services ("CMS") for $3.6 million, based on its fraudulent re-hospitalization rate.

6. Third, OHH improperly completes required paperwork. Both Medicare and Medicaid require that all inpatient orders (i.e., the doctor's instructions to admit a patient)

are signed prior to discharge. In the past, Defendant commonly billed Medicare and Medicaid based on unsigned inpatient orders, allowing the doctors to sign the orders well after the patient was discharged.

7. Medicare is fully funded by the Federal Government.

8. Oklahoma Medicaid is a state run insurance program that receives more than 60% of its funding from the Federal Government.

9. Through each of the three fraudulent schemes, the Defendant has defrauded Medicare and Medicaid for millions of dollars.

10. These fraudulent schemes are continuing in nature, through the present.

## JURISDICITION AND VENUE

11. This Court has subject matter jurisdiction over this action under 31 U.S.C. §§ 3730 and 3732.

12. This Court has personal jurisdiction over Defendants pursuant to 31 U.S.C. § 3732(a) because Defendants transacts business in this judicial district.

13. Venue is proper in this District pursuant to 31 U.S.C. § 3732(a) and under 28 U.S.C. § 1391(c) because Defendants transacts business in this judicial district.

## PARTIES

***Relator Jenniffer Baird***

14. Jenniffer Baird has been in the healthcare industry for more than 20 years. She graduated with an Associate's Degree in Nursing from Oklahoma City Community

College in 1994. She received her Bachelor's Degree in Nursing from the University of Oklahoma in 2008. Baird is a registered nurse in both Oklahoma and Colorado. Her professional certifications include a Commission for Case Manager Certification, Clinical Research Professional, and Advanced Cardiovascular Life Support, among others.

15. For approximately seventeen years, Baird has worked for OHH. She is currently the Manager of Case Management, overseeing a staff of seven people. Baird's duties include the management of all clinical documentation, development and implementation of the hospital's discharge planning, access to case management, and regular utilization reviews.

16. Baird also routinely contacts insurance companies to ensure payment and justify inpatient treatment for the entire OHH South campus.

17. Baird is responsible for improving clinical documentation. As such, she has access to patient billing records. In this role, Baird uncovered OHH's fraudulent billing schemes in the normal course and scope of her employment.

18. Throughout her tenure, Baird has received outstanding performance reviews; she routinely is rated as "exceeds expectations."

19. Baird is the original source of the information provided in this complaint.

***Defendant Oklahoma Heart Hospital***

20. Oklahoma Heart Hospital was formed in 2003 when the Oklahoma Cardiovascular Associates physicians' group purchased the hospital.

21. OHH has two campuses – North and South – and both are located in Oklahoma City. The North Campus has approximately 100 beds and the South Campus has around 67. The hospital employs over seventy physicians across both campuses.

22. Estimates of OHH's insurance payments suggest that it receives 40% from Medicare, 40% from commercial, 15% from Medicaid and 5% is self-pay or Tricare.

23. OHH has two National Provider Identifier ("NPI") numbers, one for each campus it operates: # 1841442274 for its South Campus and # 1083617005 for its North Campus.

24. OHH South billed Medicaid approximately $9,026,965.81 and Medicare approximately $64,356,294.26 for inpatient services from January 1, 2015 to July 20, 2015 alone. OHH North billed Medicaid approximately another $9,000,195.28 and Medicare approximately $102,604,649.47 in the same timeframe.

## FACTUAL ALLEGATIONS

25. Mercy Mathew is OHH's Director of Case Management and Baird's supervisor.

26. Mathew once told Baird: "If we have 1,000 Medicaid patients and the State audits three of them, sure we might have to re-pay 100% of those claims, but, guess what, we were still paid for 997 of them."

27. OHH has adopted at least three schemes to either over bill for care provided or falsify statistics to induce greater payments from the government.

## I.  Defendant Bills Almost All Medicaid Patients As Inpatients

28.    OHH management, including Matthew, has instructed case managers to change the status of nearly all Medicaid patients to inpatient, whether the treating physician orders inpatient treatment or not.  This way, OHH can bill Medicaid the maximum possible amount for care of the patient.

29.    Oklahoma Medicaid reimburses inpatient procedures at a much higher rate than if the same treatment is performed as an outpatient procedure.  A hospital may be reimbursed at much higher rate for inpatients because of the additional expenses incurred in caring for a patient for the extended period of time.

30.    For example, the Diagnosis Related Group ("DRG") for a stent (DRG #247) is reimbursed at $544 if performed as an outpatient procedure, but $12,578 if the same procedure requires inpatient treatment.  Oklahoma Medicaid similarly reimburses spinal Anterior Cervical Discectomy and Fusion procedures (DRG #473) at $1,127 for outpatients and $9,410 for inpatients.

31.    When a patient arrives, the physician assesses his or her situation and determines whether inpatient or outpatient treatment is required.

32.    OHH uses the InterQual Criteria for admission requirements. In order to be considered an inpatient by InterQual standards, strict criteria must be met.

33.    Over the past five to six years, Mercy Mathew has instructed OHH's case managers (who Baird supervises) to change the physicians' orders so that all Medicaid

patients are admitted into inpatient treatment, regardless of the physician's initial order or the InterQual standards.

34. As a result, even patients with mild health problems, such as "chest pains," are admitted as inpatients. OHH then bills Medicaid for the inpatient treatment even though the patients were given outpatient treatment.

35. Mathew misleads the case managers by telling them that Medicaid will not pay for a patient listed as observation/outpatient, so the case managers must change Medicaid patients to inpatients in order for OHH to be reimbursed for their care.

36. Baird has personally been present to hear Mathew give such instructions, most recently in early July 2015. After Mathew misrepresented the Medicaid reimbursement process to a case manager, Baird pulled the case manager aside and explained the actual system. Baird told the case manager to follow what the case manager believes is correct and Baird would deal with any repercussions from Mathew.

37. Prior to the instance in July 2015, Baird heard Mathew give the same false information to case managers about two years ago.

38. Whether upper management instructed Mathew to orchestrate the fraudulent change of Medicaid patient statuses is unclear, but Baird can confirm that Chief Operating Officer John Austin is aware of Mathew's instructions to case managers.

39. In or about late July/early August 2015, Baird was present for a discussion involving Mathew and Austin regarding the inpatient capacity. OHH South is licensed for 47 inpatient beds and at the time was at 110% capacity. In order to avoid penalties,

Mathew and Austin were discussing ways to manipulate the statistics to show a 99% usage.

40. Rather than ceasing the Medicaid fraud scheme that falsely creates inpatients, Austin stated that the practice must continue. Instead, Austin told Mathew to have her staff list fewer non-Medicaid patients as inpatients to avoid penalties while continuing to defraud Medicaid.

41. OHH's inpatient fraud scheme can be readily seen by contrasting the charts of 55 year-old Oklahoma Medicaid beneficiary, Patient 1, and 60 year-old non-Medicaid patient, Patient 2. Both patients received stents at OHH in late July, 2015, and both procedures were performed by Dr. Asim Chohan.

42. Both Patient 1 and Patient 2 were given preoperative diagnoses of coronary artery disease; both were given post-operative diagnoses of two-vessel coronary artery disease (Patient 2's was listed as severe). Both underwent left heart catheterizations with left ventriculograms and both underwent selective coronary angiographies. Patient 1 received a stent (ostium left circumflex 4.0 x 15 mm). Patient 2 received two stents (one mid left anterior descending artery and one mid-to-distal right coronary artery) and Patient 2 also underwent a laser artherectomy (left anterior descending artery intrastent stenosis).

43. Dr. Chohan first listed both Patient 1 and Patient 2 as extended outpatients. However, within ten minutes of Dr. Chohan listing Patient 1 as an extended outpatient, a

new inpatient order was entered by Toby Harrison, R.N. and case manager, per an apparent verbal instruction from Dr. Chohan.

44.    Patient 1 was admitted at 7:46 am on July 21, 2015 and discharged at 11:51 am the next day; Patient 2 was admitted at 1:46 pm on July 28, 2015, and discharged at 9:27 am the next day.

45.    The descriptions of Patient 1's and Patient 2's respective procedures, especially the stent procedures, are remarkably similar. Patient 2 is older and required a second stent and the laser artherectomy, yet because he was not a Medicaid patient, he remained an outpatient.  Patient 1, by contrast, is a Medicaid patient and he was converted to an inpatient.

Cath Reports

| | |
|---|---|
| Result type: | Cath Reports |
| Result date: | 21 July 2015 0:00 |
| Result title: | Cath Report |
| Performed by: | Chohan M.D., Asim J on 21 July 2015 13:13 |
| Verified by: | Chohan M.D., Asim J on 21 July 2015 15:22 |
| Encounter info: | [redacted] SOHH, Inpatient, 7/21/2015 - |

**DATE OF PROCEDURE:**
07/21/2015

**PREOPERATIVE DIAGNOSIS:**
Coronary artery disease.

**POSTOPERATIVE DIAGNOSIS:**
Two-vessel coronary artery disease.

**NAME OF PROCEDURES:**
1. Left heart catheterization with left ventriculogram.
2. Selective coronary angiography.
3. Stent, ostium left circumflex 4.0 x 15 mm.

**OPERATOR:**
Asim J. Chohan, M.D.

Cath Reports

| | |
|---|---|
| Result type: | Cath Reports |
| Result date: | 28 July 2015 0:00 |
| Result title: | Cath Report |
| Performed by: | Chohan M.D., Asim J on 28 July 2015 0:00 |
| Verified by: | Chohan M.D., Asim J on 29 July 2015 8:27 |
| Encounter info: | SOHH, Observ/Ext OutPT, 7/28/2015 - 7/29/2015 |

**DATE OF PROCEDURE:**
07/28/2015

**PREOPERATIVE DIAGNOSIS:**
Coronary artery disease.

**POSTOPERATIVE DIAGNOSIS:**
Severe 2-vessel coronary artery disease.

**NAME OF PROCEDURES:**
1. Left heart catheterization with left ventriculogram.
2. Selective coronary angiography.
3. Laser arthrectomy, left anterior descending artery intrastent stenosis.
4. Stent, mid left anterior descending artery.
5. Stent, mid-to-distal right coronary artery, bare metal.

**PROCEDURE PERFORMED BY:**

46. A phantom verbal order from a physician to change a Medicaid patient to an inpatient is almost standard operating procedure for case managers under Mathew; Patient 1's case exemplifies this.

47. Patient 1's physician's order and progress notes do not suggest any need for inpatient care as required by Okla. Admin. Code § 317:30-3-1(f). Indeed, Dr. Chohan's plan for Patient 1 states the patient "will be discharged in the morning with outpatient

followup . . . ." Patient 1was discharged the next day.

7. Eccentric 85% to 90% lesion with calcification, proximal and ostium of the left circumflex.
8. Successful bare metal stent, proximal and ostium of the circumflex.

**PLAN:**
1. The patient will have sheath removed, will be discharged in the morning with outpatient followup on dual antiplatelet therapy and statin therapy.
2. The patient will require evaluation of the proximal left anterior descending artery with intravascular ultrasound or fractional flow reserve depending on symptomatology.
3. Distal circumflex has 70% residual lesion which means it will require revascularization at some point.
4. Chronic total occlusion of the right coronary artery may be considered for revascularization.

48. The scheme is further laid bare by the fact that almost every Medicaid patient is given inpatient status (like Patient 1) while Medicare patients and privately insured patients (like Patient 2) are not. Baird has noticed a pattern of several common DRGs that should typically be outpatient procedures, but OHH routinely bills them as inpatient procedures.

49. Baird has documentation for several more Medicaid beneficiaries who received procedures that should have been completed as outpatient treatment but were instead billed as inpatient, including Patient 3 (stating patient "will be discharged in the morning with outpatient followup"), Patient 4 (listing admission status as "Outpatient Referral" but discharged as an inpatient), Patient 5 (stating patient "was admitted and observed overnight"), Patient 6 (admitted and discharged the following day), Patient 7 (admitted and discharged the following day with "moderate" pain "at worst"), Patient 8 ("admitted to the hospital for observation"), Patient 9 (admitted and discharged the following day), Patient 10 (admitted and discharged the following day), Patient 11

(admitted and discharged the following day), Patient 12 (a 36-year-old complaining of chest pain but "in no distress currently"), Patient 13 (admitted and discharged the following day), and Patient 14 (admitted and discharged the following day).

50. In each of these instances, the treatments OHH administered are typically outpatient procedures, yet OHH billed each to Medicaid as inpatients.

51. OHH uses Stockell software for its billing procedures. Within Stockell, patient status reports showing those changed from Observation to Inpatient are available.

52. Baird estimates that as many as 9 in 10 Medicaid patients that OHH bills as an inpatient should actually be billed as outpatient.

**II. Manipulation Of Re-Hospitalization Rates For Medicare Bonuses**

53. In an attempt to incentivize a hospital's quality of care (and not just its quantity of care), the Affordable Care Act created Hospital Value-Based Purchasing (HVBP).

54. Medicare will take a hospital's data and determine at what rate Medicare patients have to be re-admitted as inpatients for the same illness within 30 days of discharge for treatment of that same illness. Hospitals that have re-admission rates higher than the national average must pay a fine; hospitals with rates below the national average receive a bonus.

55. OHH fraudulently manipulates its re-admission records in order to get the re-admission incentive; OHH keeps its re-admission rate low by listing Medicare patients as outpatients if they return within 30 days of their previous discharge.

56.     While this practice costs OHH on the front end (opposite of the Medicaid scheme described above), OHH more than recoups the loss on the back end via the bonus it receives for the low rates.

57.     Baird attended a senior management meeting where it was reported the OHH received a $3.6 million bonus for its low re-admission rates for 2014.

58.     The case of Patient 15 illustrates this scheme.  On July 16, 2014, Patient 15, was admitted as an inpatient suffering from Congestive Heart Failure with Acute Myocardial Infarction.  Patient 15 was discharged on July 21, 2014.

59.     Patient 15 returned to the OHH emergency room on August 11, 2014, complaining of chest pains.  A chest x-ray revealed that Patient 15 had signs of Congestive Heart Failure, the same issue she was admitted, and treated for, on in mid-July, 2014, and Patient 15's initial chart shows that Patient 15 was to be admitted as an inpatient.

60.     However, by the time of Patient 15's discharge on August 13, 2014, Patient 15's status was listed as outpatient/observation.

61.     Another telling indicator that OHH manipulates its re-hospitalization rate is the number of times OHH physicians put a patient on observation status for more than 24 hours.  Keeping a patient on observation status for over 24 hours is typically not medically necessary, and it's almost never necessary to keep a patient for observation over 72 hours.

62.     Indeed, according to Medicare regulations at 42 C.F.R. § 412.3(d)(1):

> Surgical procedures, diagnostic tests, and other treatment are generally appropriate for inpatient admission and inpatient hospital payment under Medicare Part A when the physician expects the patient to require a stay that crosses at least 2 midnights. The expectation of the physician should be based on such complex medical factors as patient history and comorbidities, the severity of signs and symptoms, current medical needs, and the risk of an adverse event.

63. Since the third quarter of 2011, at least 840 patients have remained on observation status at OHH for more than 48 hours.

| | OHH North | | | OHH South | | | OHH TOTAL |
|---|---|---|---|---|---|---|---|
| Quarter | Over 48 hrs | Over 72 hrs | Total | Over 48 hrs | Over 72 hrs | Total | |
| 2011_Q3 | 18 | 3 | 21 | - | - | 0 | 21 |
| 2011_Q4 | 19 | 9 | 28 | - | - | 0 | 28 |
| 2012_Q1 | 25 | 1 | 26 | 25 | 3 | 28 | 54 |
| 2012_Q2 | 19 | 1 | 20 | 45 | 3 | 48 | 68 |
| 2012_Q3 | 20 | 3 | 23 | 36 | 10 | 46 | 69 |
| 2012_Q4 | 20 | 6 | 26 | 37 | 7 | 44 | 70 |
| 2013_Q1 | 18 | 2 | 20 | 38 | 8 | 46 | 66 |
| 2013_Q2 | 18 | 8 | 26 | 27 | 10 | 37 | 63 |
| 2013_Q3 | 36 | 17 | 53 | 31 | 17 | 48 | 101 |
| 2013_Q4 | 37 | 11 | 48 | 35 | 25 | 60 | 108 |
| 2014_Q1 | 18 | 2 | 20 | 24 | 11 | 35 | 55 |
| 2014_Q2 | 5 | 0 | 5 | 8 | 0 | 8 | 13 |
| 2014_Q3 | 3 | 0 | 3 | 15 | 0 | 15 | 18 |
| 2014_Q4 | 6 | 0 | 6 | 11 | 2 | 13 | 19 |
| 2015_Q1 | 8 | 3 | 11 | 22 | 4 | 26 | 37 |
| 2015_Q2 | 17 | 3 | 20 | 24 | 6 | 30 | 50 |
| | | | | | | | **840** |

## III. Billing For Unsigned Orders

64. Both Medicare and Medicaid require inpatient admission orders be timely signed by the treating physician (or at their direction) to ensure the proper treatment and oversight is maintained.

65. OHH routinely ignores these requirements, and submits claims for reimbursement to Medicare and Medicaid that are supported by unsigned orders, and the government has paid for inpatient services based on these unauthorized orders.

66. OHH allows doctors to sign orders well after patients are discharged in violation of CMS and OHCA regulations.

67. Baird has been present for multiple administrative meetings in the past four to five years where this practice has been discussed. The issue has been raised with the Chief Information Officer for the OHH: currently Michelle Mullins and prior to her, Steve Miller.

68. Both officers acknowledged issues with post-discharge authentication but neither took any action until recently.

69. Baird acknowledges that since approximately 2014, this practice has been curtailed at OHH; nonetheless OHH has engaged is significant fraudulent conduct over an extended period of years prior to this time period.

## IV. OHH Intends To Falsify Its Inpatient Usage To Avoid Penalties

70. Baird has recently learned that OHH intends to manipulate its inpatient usage capacity.

71. Hospitals are subject to penalties if their inpatients exceed the capacity of inpatient beds for which they are licensed.

72. In or around August 2015, OHH exceeded its capacity; as of September 2015, OHH is at 110% of its inpatient capacity.

73.     Baird has personal knowledge that Mercy Mathew, John Austin, Chief Financial Officer Carol Walker, Chief Nursing Officer Peggy Tipton, and Chief Executive Officer John Harvey have been in recent meetings regarding the best way to manipulate the numbers to avoid the penalty.

74.     As noted above, Mathew and Austin had already discussed cutting back on the Medicaid fraud by falsely listing patients as inpatients as an option to reduce the capacity rate, but they rejected this idea. Instead, they agreed to continue the Medicaid inpatient fraud scheme and developed another fraudulent scheme to manipulate the overall inpatient numbers.

75.     On Monday, September 14, 2015, Baird received a call from Dr. Parker Truong, Cardiologist, regarding one of his patients with acute Myocardial Infarction that required an inpatient admission.

76.     OHH did not list the patient as an inpatient.

77.     Baird told Dr. Truong that OHH was at 110% capacity. Dr. Truong replied that he remembered a call from Dr. John Harvey where Dr. Harvey explained that Case Management would be leaving more patients as outpatient.

78.     Dr. Truong then told Baird that as long as Case Management knew what they were doing, he guessed it would be okay, even though he was clear this patient should have been an inpatient.

79. While as of the date of this filing, OHH has not yet certified or submitted its inpatient capacity usage rate to CMS to Baird's knowledge, Baird believes it is only a matter of time until this fraud is committed.

## V. Baird's Disclosures

80. Approximately three years ago, Baird went to Austin, still COO at that time, to discuss OHH's manipulation of patient records. Baird told Austin that the practices were "borderline fraud."

81. Austin promised to "look into it."

82. About one week later, Austin stopped Baird in the hallway and told her that the hospital was "building relationships" so she would no longer need to worry about OHH getting in trouble for any fraud.

83. Baird has not recently raised concerns directly, as she has feared for her job.

84. However, Baird has recently instructed a new case manager that Mathew's instructions about observation status and Medicaid payments is incorrect, and that the case manager should properly list patients according to the level of care needed.

## <u>COUNT I</u>
## Violation of the False Claims Act 31 U.S.C. § 3729(a)(1)(A)

85. Baird re-alleges and incorporates the allegations set forth above as though fully alleged herein.

86.    OHH, by and through its officers, agents, supervisors, and employees, knowingly presented or caused to be presented to the government and its officials, false or fraudulent claims in order to obtain payment or approval from the government, in violation of 31 U.S.C. § 3729(a)(1)(A).

87.    31 U.S.C. § 3729(a)(1)(A) imposes liability on a person who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval."

88.    OHH violates 31 U.S.C. § 3729(a)(1)(A) in three ways.

89.    First, each submission of a claim for inpatient services under Medicaid is a violation. The certification that inpatient treatment is medically necessary is a false claim made to induce the government to pay for unnecessary and/or undelivered services.

90.    Second, each time OHH submits its re-hospitalization rates for the Hospital Readmissions Reduction Program, it submits a false claim made to induce the government to award a bonus and avoid a penalty.

91.    Third, each time OHH submitted unsigned orders for payment, it violated § 3729(a)(1)(A) because it falsely certified that the orders were properly authorized which induced the government to pay when it would not have paid otherwise.

92.    The United States of America has been damaged by all of the aforementioned misrepresentations and failures to comply with requisite laws and regulations in an as of yet undetermined amount through its funding of the Medicare program and its partial funding of the Oklahoma Medicaid Program.

**COUNT II**

**Violation of the False Claims Act 31 U.S.C. § 3729(a)(1)(B)**

93. Baird re-alleges and incorporates the allegations set forth above as though fully alleged herein.

94. OHH, by and through its officers, agents, supervisors, and employees, knowingly presented or caused to be presented to the government and its officials, false or fraudulent claims in order to obtain payment or approval from the government, in violation of 31 U.S.C. § 3729(a)(1)(B).

95. 31 U.S.C. § 3729(a)(1)(B) imposes liability on a person who "knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government."

96. OHH violates § 3729(a)(1)(B) in three ways.

97. Each fraudulent inpatient status in the patient record constitutes "a false record or statement to get a false or fraudulent claim paid." Case managers are making false statements when they record an inpatient status changed based on non-existent verbal orders.

98. The same violation occurs when OHH falsifies patient records to induce the government to pay a bonus based on the re-hospitalization rate.

99. Again, each post-discharge signature is also a false record that violates § 3729(a)(1)(B).

100. The United States of America has been damaged by all of the aforementioned misrepresentations and failures to comply with requisite laws and regulations in an as of yet undetermined amount through its funding of the Medicare program and its partial funding of the Oklahoma Medicaid Program.

## COUNT III

### Violation of the False Claims Act 31 U.S.C. § 3729(a)(1)(G)

101. Baird re-alleges and incorporates the allegations set forth above as though fully alleged herein.

102. OHH, by and through its officers, agents, supervisors, and employees, knowingly presented or caused to be presented to the government and its officials, false or fraudulent claims in order to obtain payment or approval from the government, in violation of 31 U.S.C. § 3729(a)(1)(G).

103. 31 U.S.C. § 3729(a)(1)(G) attaches liability if a person:

> [K]nowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government.

104. Through its manipulation of the re-hospitalization rate, and to the extent OHH's actual rate was below the national average, it owes the government money.

105. Therefore, OHH would have knowingly made a "false record or statement material to an obligation to pay or transmit money or property to the Government," decreasing its obligation to pay the government.

106. If and when OHH submits false inpatient capacity rates to avoid a penalty, it will also violate 31 U.S.C. § 3729(a)(1)(G).

107. The United States of America has been damaged by all of the aforementioned misrepresentations and failures to comply with requisite laws and regulations in an as of yet undetermined amount.

**COUNT IV**
**Violation of the Oklahoma Medicaid False Claims Act**
**Okla. Stat. Title 63, § 5053.1(B)(1)**

108. Baird re-alleges and incorporates the allegations set forth above as though fully alleged herein.

109. OHH, by and through its officers, agents, supervisors, and employees, knowingly presented or caused to be presented to the state and its officials, false or fraudulent claims in order to obtain payment or approval from the state, in violation of Okla. Stat. Title 63, § 5053.1(B)(1).

110. Okla. Stat. Title 63, § 5053.1(B)(1) attaches liability to a person who "[k]nowingly presents, or causes to be presented, to an officer or employee of the State of Oklahoma, a false or fraudulent claim for payment or approval."

111. OHH violates Okla. Stat. Title 63, § 5053.1(B)(1) in two ways.

112. First, each submission of a claim for inpatient services under Medicaid is a violation. The certification that inpatient treatment is medically necessary is a false claim made to induce the state to pay for unnecessary and/or undelivered services.

113. Second, each time OHH submitted unsigned orders for payment, it violated Okla. Stat. Title 63, § 5053.1(B)(1) because it falsely certified that the orders were properly authorized which induced the state to pay when it would not have paid otherwise.

114. The State of Oklahoma has been damaged by all of the aforementioned misrepresentations and failures to comply with requisite laws and regulations in an as of yet undetermined amount through its funding of the Oklahoma Medicaid Program.

**COUNT V**
**Violation of the Oklahoma Medicaid False Claims Act**
**Okla. Stat. Title 63, § 5053.1(B)(2)**

115. Baird re-alleges and incorporates the allegations set forth above as though fully alleged herein.

116. OHH, by and through its officers, agents, supervisors, and employees, knowingly presented or caused to be presented to the state and its officials, false or fraudulent claims in order to obtain payment or approval from the state, in violation of Okla. Stat. Title 63, § 5053.1(B)(2).

117. Okla. Stat. Title 63, § 5053.1(B)(2) attaches liability to a person who "[k]nowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the state."

118. OHH violates Okla. Stat. Title 63, § 5053.1(B)(2) in two ways.

119. Each fraudulent inpatient status in the patient record constitutes "a false record or statement to get a false or fraudulent claim paid or approved by the state." Case managers are making false statements when they record an inpatient status changed based on non-existent verbal orders.

120. Also, each post-discharge signature is also a false record that violates § 5053.1(B)(2).

121. The State of Oklahoma has been damaged by all of the aforementioned misrepresentations and failures to comply with requisite laws and regulations in an as of yet undetermined amount through its funding of the Oklahoma Medicaid Program.

**PRAYER FOR RELIEF**

WHEREFORE, the Relator Jenniffer Baird, acting on behalf of, and in the name of, the United States of America and on her own behalf, prays that judgment be entered against Defendant for violations of the False Claims Act as follows:

(a). In favor of the Relator for the maximum amount pursuant to 31 U.S.C. § 3730(d) to include reasonable expenses, attorney's fees, and costs incurred by the Relator;

(b). In favor of the United States against Defendants for treble damages to the federal government from the submission of false claims, and the maximum civil penalties for each violation of the False Claims Act;

(c). For all costs of this False Claims civil action;

(d). In favor of Relator and the United States for further relief as this Court deems to be just and equitable; and

(e). Any other such relief that the Court may deem just and appropriate.

Respectfully Submitted,

*/s/ Wayne Allison*
Wayne Allison
ALLISON LEGAL
2004 Huntington Ave.
Nichols Hills, OK 73116
(405) 888-6933; (405) 250-2782
(866) 266-2781 (facsimile)
wayne@allisonlegal.com
*Counsel for Plaintiff Jenniferr Baird*

*/s/ R. Scott Oswald*
R. Scott Oswald (*pending admission to the Western District of Oklahoma*)
The Employment Law Group, P.C.
888 17th Street, N.W., Suite 900
Washington, D.C. 20006
(202) 261–2803
(202) 261–2835 (facsimile)
soswald@employmentlawgroup.com
*Counsel for Plaintiff Jenniferr Baird*